# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION
# 4512 Rogers Road, Duplex Side A, Chattanooga, Tennessee

## INTRODUCTION

1. I, James Hixson ("Affiant"), being duly sworn, depose and state as follows:

2. I am a Task Force Officer with the Drug Enforcement Administration ("DEA") Field Office in Chattanooga, Tennessee. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3. I have been employed as a police officer with the Chattanooga Police Department in Chattanooga, Tennessee, for approximately 23 years. I have been assigned as an investigator in the field of narcotics investigations for approximately 17 years. I am currently assigned as a Task Force Officer for the DEA Chattanooga Resident Office. I have been a Task Force Officer for approximately 14 years. During my tenure as an investigator assigned to narcotics investigations, I have gained a working knowledge of narcotics trafficking methods and techniques. My present duties include the investigation of violations of federal law by individuals involved in the sale and distribution of controlled substances.

4. During my experiences and tenure as a narcotics investigator and Task Force Officer, I have investigated and participated in investigations of organized criminal groups violating federal drug trafficking laws. As part of my official duties, I have utilized most traditional law enforcement techniques, including: visual surveillance, witness interviews, execution of search warrants, the use of cooperating witnesses, seizure of drug evidence, controlled purchases of drug evidence, court-authorized pen registers, court-authorized interceptions of wire communications, and undercover techniques. I have debriefed numerous cooperating defendants

and confidential informants regarding the habits, practices, methods, and general behavior of criminal groups engaged in organized criminal activity. I have personally participated in Title III wire intercept investigations, including investigations involving large-scale drug trafficking organizations and drug traffickers. I have received specialized training in conducting drug investigations and have attended numerous conferences and lectures featuring government attorneys and law enforcement officials. Over the course of my career, I have participated in numerous arrests of known drug traffickers and their associates. This experience has afforded me an opportunity to observe and investigate methods, schemes, and operations used by organized groups, including the use of cellular telephones and of digital display paging devices, and their use of numerical codes and code words to conduct their transactions. In addition, I have participated in investigations concerning the concealment of proceeds of controlled substances, including assets, monies, and bank records, and the identification of co-conspirators through the use of drug ledgers, telephone toll records, telephone bills, photographs, and financial records. These investigations have resulted in the arrest of individuals who have smuggled, received, and/or distributed controlled substances, including methamphetamine, cocaine hydrochloride, cocaine base, heroin, and marijuana, as well as the seizure of controlled substances and the proceeds of the sale of these controlled substances. I know based upon my training and experience that narcotics traffickers and money laundering organizations routinely use several operational techniques. These practices are designed and implemented to achieve two paramount goals: first, the successful facilitation of the organization's illegal activities that consist of the transportation and distribution of controlled substances and subsequent collection of the proceeds of that illegal activity; and second, minimizing the exposure of organization

2

members, particularly those operating in management roles, from investigation and prosecution by law enforcement.

## PURPOSE OF AFFIDAVIT

1. This affidavit is submitted in support of an application for a search and seizure warrant for a residence associated with Orlando WATKINS located at **4512 Rogers Road Duplex Side A, Chattanooga, Tennessee**, further described in Attachment A of this affidavit. Your Affiant and other law enforcement officers have corroborated information in furtherance of this investigation through the seizure of controlled substances, recorded telephone calls, interviews of confidential sources, and physical surveillance. This affidavit does not include each and every fact known to your Affiant but rather contains sufficient facts to establish probable cause to support the search warrant application and order.

2. Based upon your Affiant's training, experience, and participation in investigations involving controlled substances, your Affiant knows:

   a. That drug traffickers very often place assets in names other than their own to avoid detection of these assets by government agencies;

   b. That drug traffickers very often place assets in corporate entities in order to avoid detection of these assets by government agencies;

   c. That even though these assets are in other persons' names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them;

   d. That large-scale narcotics traffickers may maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business;

3

e. That narcotics traffickers maintain books, records, receipts, notes ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That narcotics traffickers commonly "front" (provide narcotics on consignment) controlled substances to their clients; that the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the traffickers have ready access to them;

f. That it is common for large-scale drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residence, their businesses and/or other locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities;

g. That, in order to accomplish this concealment, narcotics traffickers frequently build "stash" places within their residences or businesses. That there are a number of publications available instructing where and how to build "stash" places. Copies of these types of publications have been found in the residences of narcotics traffickers;

h. That it is common for persons involved in large-scale narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are

4

maintained by the narcotics traffickers within their residences, businesses or other locations which they maintain dominion and control over;

i. That large-scale traffickers often utilize electronic equipment such as computers, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, records and/or store the information described above;

j. That when drug traffickers amass large proceeds from the sale of drugs that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize, including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys, and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

k. That the sale of controlled substances generates quantities of United States currency in small denominations (commonly referred to as "street money");

l. That it is common for drug dealers to physically handle and count the "street money" after receiving it in exchange for the controlled substances, thereby leaving residue traces of controlled substances on the "street money." That law enforcement agencies own dogs which are trained to react to the scent of controlled substances and residue traces of controlled substances; and that those trained dogs have reacted to narcotics tainted currency negotiated at banks and concealed in the residences of narcotics traffickers;

5

m. That the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and narcotics transactions;

n. That the Currency Transaction Report (CTR) (IRS form 4789), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000 causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution;

o. That, in order to evade the filing of a CTR, narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

p. That narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses;

q. That controlled substances traffickers commonly maintain addresses of telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

r. That drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product and that these traffickers usually maintain these photographs in their possession;

s. That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

t. That drug traffickers commonly have in their possession, that is on their person, at their residences and/or their businesses, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Said firearms are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to: narcotics, jewelry, narcotics paraphernalia, books, records and U.S. currency;

u. That drug traffickers frequently use cellular telephones and keep a list of names and numbers of customers and suppliers in their electronic address books of their cellular telephones. Such cell phones will also carry information in a SIM (Subscriber Identity Module) card, or some other type of electronic storage card, which will reveal the number of the cell phone and other information, leading to the identity of the user.

3. The investigation into Orlando WATKINS, including confidential source information, physical surveillance, toll analysis, court-authorized pen registers, and court-authorized Title III intercepts indicate that WATKINS is a heroin (a Schedule I controlled substance) and fentanyl (a

7

Schedule II controlled substance) dealer, operating in the Chattanooga and Tullahoma, Tennessee, areas. WATKINS was intercepted throughout the court-authorized Title III intercepts of Monte Brewer. WATKINS has also been identified as a member of the Gangster Disciples street gang in Chattanooga. WATKINS was first validated, by officers of the Chattanooga Police Department, as a Gangster Disciple in 2013. The following is information concerning the criminal history of Orlando WATKINS. WATKINS's known criminal history dates to August 2008. Since 2008, WATKINS has been arrested on a number of drug offenses including "Possession of Marijuana for Resale" and "Possession of Crack Cocaine for Resale." In 2011, WATKINS received a 3-year sentence for "Crack for Resale." WATKINS has also been arrested for crimes of violence including "Possession of a Firearm," "Attempted First Degree Murder," Aggravated Assault," "Employing a Firearm During a Dangerous Felony," and "Reckless Endangerment." WATKINS pled guilty to "Aggravated Assault" for which he received a 3-year sentence. WATKINS was recently arrested in Walker County, Georgia for "Possession of a Schedule I or II Controlled Substance with the Intent to Distribute," "Receipt, Possession or Transfer of Firearm by a Convicted Felon or Felony First Offender," "Theft by Receiving Stolen Property," and "Possession of Firearm or Knife During Commission of or Attempt to Commit Certain Felonies."

### FACTS AND CIRCUMSTANCES GIVING RISE TO PROBABLE CAUSE THAT ORLANDO WATKINS IS DISTRIBUTING ILLEGAL DRUGS AND UTILIZING 4512 ROGERS ROAD, DUPLEX SIDE A, AS A BASE FOR THIS ILLEGAL BUSINESS

1. On March 16, 2018, Hamilton County Criminal Court Judge Don Poole authorized the interception of telephonic communications of Orlando WATKINS. This authorization was the result of an investigation into Monte Brewer. The investigation revealed that Orlando WATKINS was a heroin (a Schedule I controlled substance) source of supply for Brewer.

8

Court-ordered interception of WATKINS's telephone began on March 19, 2018, and continued to April 17, 2018.

2. During the court-authorized intercept of WATKINS's cell phone, there were approximately 414 pertinent calls and 811 pertinent text messages intercepted. Below are a summary of cellular phone calls intercepted during the court-authorized interception period. This summary of calls include calls that support the belief that WATKINS is utilizing **4512 Rogers Road, Duplex Side A, in Chattanooga, Tennessee,** in addition to several other locations, to conduct narcotics transactions.

    a. On April 02, 2018, WATKINS was intercepted talking with an unidentified male. Based on your Affiant's training, experience, and knowledge of the investigation to this point, WATKINS and the unidentified male discuss the unidentified male wanting to purchase a "Zip" (ounce) from WATKINS. Your Affiant knows "Zip" to be a slang term utilized to describe an ounce of an illegal substance. WATKINS tells the unidentified male to meet him at his "Unc's" house on "Rogers" to consummate the transaction. The investigation has shown that when WATKINS refers to "Rogers" he is referring to the residence at **4512 Rogers Road, Duplex Side A, in Chattanooga, Tennessee.**

    b. On April 06, 2018, WATKINS was intercepted making an outgoing call to an unidentified male. Based on your Affiant's training, experience, and knowledge of the investigation to this point, WATKINS and the unidentified male discuss a narcotics transaction for "50." WATKINS tells the unidentified male that he is on "Rogers," requesting the unidentified male to meet WATKINS at **4512 Rogers Road, Duplex Side A** to consummate the transaction.

9

Case 1:18-mj-00051-TRM   Document 2   Filed 05/18/18   Page 9 of 19   PageID #: 10

c. On April 12, 2018, WATKINS was intercepted on an outgoing call with an unidentified male. Based on your Affiant's training, experience, and knowledge of the investigation to this point, WATKINS and the unidentified male discuss meeting to conduct a narcotics transaction for a half ounce ("Split"). Your Affiant knows "Split" to be a slang term utilized to describe a half ounce of an illegal substance. WATKINS and the unidentified male agree to meet at **4512 Rogers Road, Duplex Side A in Chattanooga, Tennessee,** to consummate the transaction.

3. The investigation into **4512 Rogers Road** has revealed that the residence is a duplex. On every occasion that surveillance units observed WATKINS arrive at **4512 Rogers Road,** he was observed parking in the driveway on the right side of the residence, if you are facing the residence from the road. The right side of the residence was identified as "Side A." Additionally, an inquiry into **4512 Rogers Road, Side A** revealed that Marsha Kidd has utilities at this residence. During the court authorized-intercept period of Watkins, a female that refers to herself as "Auntie" and a male that refers to himself as "Unc" use a cellular phone subscribed to by Marsha Kidd. Surveillance of WATKINS revealed that when WATKINS told the user of the phone subscribed to by Kidd he would come by the residence, WATKINS was observed going to **4512 Rogers Road, Duplex Side A, in Chattanooga, Tennessee.**

4. Throughout the court-authorized period of interception of WATKINS, your Affiant and other law enforcement officers familiar with the investigation have conducted surveillance of WATKINS. WATKINS was observed meeting with individuals at **4512 Rogers Road, Duplex Side A** on several occasions throughout the interception. In addition, your Affiant has conducted surveillance on WATKINS at **4512 Rogers Road, Duplex Side A, in Chattanooga, Tennessee,**

10

as recently as April 17, 2018. WATKINS has been observed meeting with people for very brief periods of time at **4512 Rogers Road, Duplex Side A.** However, due to the location of the residence and limited places for surveillance units to establish surveillance on the residence, your Affiant has not been able to personally witness the hand-to-hand transactions occurring at this residence. However, the meetings are very quick meetings lasting only a few minutes. These brief meetings are consistent with what your Affiant knows to be consistent with narcotics transactions.

5. In total, approximately 9 calls involving WATKINS discussing meeting individuals on Rogers Road were intercepted during the court authorized period of interception. Additionally there were over 20 calls related to narcotics distribution intercepted between WATKINS and the user of the cellular phone subscribed to by Kidd. Most of those calls refer to WATKINS coming by the residence to meet people, coming by to deliver and retrieve narcotics, and warning WATKINS of law enforcement presence in the area.

6. On May 07, 2018, your Affiant conducted a toll analysis on the cellular phone utilized by WATKINS. This toll analysis confirms that WATKINS has maintained contact with the phone numbers intercepted during the court-authorized intercepts, with which WATKINS would discuss drug transactions. Additionally, your Affiant noted that WATKINS has maintained contact with the Marsha Kidd cellular phone and last contacted with that cellular phone on May 04, 2018. Your affiant believes that these contacts demonstrate that WATKINS continues to engage in drug trafficking consistent with the pattern observed by law enforcement during the period of court-authorized wire intercepts and beyond.

7. As noted above, the investigation has revealed that WATKINS has also been conducting drug trafficking activities at several known stash houses simultaneously during this same time

period, specifically, 2210 Bennett Avenue, Chattanooga, Tennessee; 4512 Rogers Road, Duplex Side A, Chattanooga, Tennessee; and 2715 13th Avenue, Chattanooga, Tennessee. On May 10, 2018, Officer C. Batterson of the Chattanooga Police Department pulled onto a gas station on 4th Avenue in Chattanooga, Tennessee. Upon arriving on the lot, Officer Batterson noticed several members of the Gangster Disciples street gang loitering on the lot, as well as Orlando WATKINS's Camero. As previously discussed, WATKINS is a confirmed member of the Gangster Disciples. As Officer Batterson pulled onto the lot, WATKINS's Camaro reversed off the lot in an erratic manner and sped off toward Foust Street. At the time, Officer Batterson had just engaged a suspect on the lot and was unable to stop the Camaro. While on patrol later, Officer Batterson located the Camaro parked at 2715 13th Avenue, one of the stash houses listed above.

8. On May 15, 2018, your Affiant conducted surveillance of 2210 Bennett Avenue, one of WATKINS's known stash houses. At approximately 8:30 PM, your Affiant observed a white Chevrolet sedan arrive at the residence. Your Affiant then observed WATKINS get out of the vehicle and enter the residence. After a few minutes, WATKINS came out of the residence and drove away in the Chevrolet sedan. Surveillance units followed WATKINS to a residence on Peachtree Street near the intersection of 12th Street, which was notable because during the court-authorized intercept of Watkins, your Affiant intercepted calls in which WATKINS met with a unidentifed black male on Peachtree Street for the purpose of distributing illegal narcotics to the unidentified black male. After a few minutes at the Peachtree Street residence, WATKINS was followed to a restaurant on Dodds Avenue. Units established surveillance of WATKINS at the restaurant where he remained for approximately 30 minutes. WATKINS was then observed leaving the restaurant and traveled to a residence off Lee Highway. WATKINS stayed at this

12

residence for a few minutes before leaving and traveling to 2715 13th Avenue, another of WATKINS's known stash houses. At 2715 13th Avenue, your Affiant observed WATKINS park the Chevrolet sedan in the driveway and enter 2715 13th Avenue through the front door. Surveillance was discontinued to avoid alerting WATKINS to the presence of law enforcement.

9. The investigation has revealed that WATKINS's drug trafficking business has operated consistently and continuously over a significant period of time, unimpeded by law enforcement or rival disruption. Based upon my training and experience investigating illegal drug trafficking, it is virtually unheard of for an established drug trafficker like WATSON, with a vigorous business and clientele, to suddenly cease operations without intervention of some kind. Thus, your Affiant believes that WATKINS's drug trafficking operation continues to this day in the same manner outlined above and as evidenced by his recent flight to one of his regular stash houses located on the 13th Avenue, as well has his recent observation at both the Bennett Avenue address and the 13th Avenue address, with the quick stop in between at an area WATKINS has previously dealt drugs.

## CONCLUSION

1.  In summary, agents of the Drug Enforcement Administration have been investigating and have obtained a substantial amount of information regarding the drug trafficking activities of Orlando WATKINS and his associates. This investigation has revealed through law enforcement surveillance, the seizure of narcotics, and recorded telephone conversations that WATKINS has been involved in the trafficking of significant amounts of heroin and other illegal narcotics for some time. Your Affiant further submits that there is probable cause to believe WATKINS utilizes the residence at **4512 Rogers Road, Duplex Side A, in Chattanooga, Tennessee,** to facilitate his drug trafficking activity through the storage and sales of narcotics.

2.  Your Affiant submits that probable cause exists to have the residence/premise/property, to include any and all outbuildings and vehicles located at the property, located at **4512 Rogers Road, Duplex Side A, Chattanooga, Tennessee,** in the Eastern District of Tennessee, searched for the following items (See Attachment B of this Affidavit):

    a. Books, photographs, records, receipts, notes, ledgers and other papers which show the transportation, ordering, purchase, distribution, possession, sale or manufacture of controlled substances;

    b. Address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers, written or typed by hand as opposed to printed commercially;

    c. Books, letters, records, computerized and electronic records, receipts, bank statements and records, money drafts, letters of credit, wire transfers, safe deposit box keys, money order and cashier's check receipts, passbooks, bank checks, and other items that reflect the expenditure, obtaining, secreting, transfer or concealment of drug proceeds;

14

d. United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, notes and other documents showing an accumulation of assets, wealth, or money to the extent that these items are found in such quantity, substance and/or quality as to permit a reasonable inference that such items are proceeds of drug trafficking;

e. Controlled substances, material and paraphernalia for manufacturing, packaging, cutting, weighing and distributing controlled substances (marijuana and cocaine) to include but not limited to scales, baggies, packing material;

f. Indicia of occupancy, residency, and/or ownership of the premises described above and other real property, including but not limited to deeds, utility and telephone bills, canceled envelopes and keys;

g. The visual image, by way of photography, of all furnishings and equipment in, on, under, attached, or appurtenant to said premises;

h. Papers, tickets, notes schedules, receipts and other documents relating to travel to and from drug source areas and drug distribution areas;

i. Firearms;

j. Cellular telephones present and used by the occupants of the residence (previously identified as "Auntie" and "Unc"), as well as cellular telephones believed to be used by WATKINS, including the electronic address book, stored memory feature and the SIM card (or similar type of electronic data storage card) of the cellular telephone;

k. Any and all other material evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846, which include manufacturing, possession with intent to distribute and

15

distribution of controlled substances; and of 18 U.S.C. § 1956, et seq, which includes money laundering.

_____
Task Force Officer, James Hixson
Drug Enforcement Administration

Sworn to and subscribed before me this
18th day of May, 2018.

_____
Travis R. McDonough
United States District Judge
Eastern District of Tennessee

## ATTACHMENT A

### Description of the Residence/Premises/Property located at
### 4512 Rogers Road, Chattanooga, Tennessee

The residence is a duplex located at 4512 Rogers Road, Chattanooga, Tennessee. The residence is described as a duplex single story brick structure, Side A, which is on the right side of the residence when viewed from the street. The mailbox fronting the residence displays the number "4512."

## ATTACHMENT B

**Items to Be Searched for at the Residence/Premises/Property Located at
4512 Rogers Road, Duplex Side A, Chattanooga, Tennessee**

(1) Books, photographs, records, receipts, notes, ledgers and other papers which show the transportation, ordering, purchase, distribution, possession, sale or manufacture of controlled substances;

(2) Address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers, written or typed by hand as opposed to printed commercially;

(3) Books, letters, records, computerized and electronic records, receipts, bank statements and records, money drafts, letters of credit, wire transfers, safe deposit box keys, money order and cashier's check receipts, passbooks, bank checks, and other items that reflect the expenditure, obtaining, secreting, transfer or concealment of drug proceeds;

(4) United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, notes and other documents showing an accumulation of assets, wealth, or money to the extent that these items are found in such quantity, substance and/or quality as to permit a reasonable inference that such items are proceeds of drug trafficking;

(5) Controlled substances, material and paraphernalia for manufacturing, packaging, cutting, weighing and distributing controlled substances, in particular cocaine and marijuana, including, but not limited to scales, baggies, packing material;

(6) Indicia of occupancy, residency, and/or ownership of the premises described above and other real property, including but not limited to deeds, utility and telephone bills, canceled envelopes and keys;

(7) The visual image, by way of photography, of all furnishings and equipment in, on, under, attached, or appurtenant to said premises;

(8) Papers, tickets, notes, schedules, receipts and other documents relating to travel to and from drug source areas and drug distribution areas;

(9) Firearms;

(10) Cellular telephones, including the electronic address book, stored memory feature and the SIM card (or similar type of electronic data storage card) of the cellular telephone; and Pagers.

(11) Any and all other material evidence of violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, and 881, which include manufacturing, possession with intent to distribute and distribution of controlled substances; and 18 U.S.C. § 1956, which includes money laundering.

2